IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BARBARITA RUIZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  4:24-cv-254 |
| | § | |
| UNITED HEALTHCARE SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Barbarita Ruiz ("Ruiz" or "Plaintiff") files this Original Complaint against United HealthCare Services, Inc. ("Defendant").

**THE PARTIES AND JURISDICTION**

1.      Plaintiff is a natural person residing within the confines of the Southern District of Texas, Houston Division.  Plaintiff has standing to file this lawsuit.

2.      Defendant United HealthCare Services, Inc. is a Minnesota corporation conducting business in the Southern District of Texas, Houston Division.

3.      Defendant may be served with this Complaint through its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

4.      The Court has subject matter jurisdiction over this case based on federal question jurisdiction under the Americans with Disabilities Act.

5.      Venue is appropriate in the Southern District of Texas, Houston Division, because a substantial part of the events giving rise to the claims in this lawsuit occurred in this judicial district.

## FACTUAL BACKGROUND

6.      Ruiz, a licensed vocational nurse ("LVN"), began working remotely for Defendant as a Health and Social Service Coordinator on February 14, 2022.  Ruiz's primary job duty was to process patient assessments for Defendant, a healthcare benefits business.

7.      Ruiz would call a patient during a designated window, obtain all requisite information, and complete all required forms on the patient's behalf.  Call-backs were often necessary because a sick patient might not be able to talk for long or could simply be unavailable to speak at all.  Even for an experienced coordinator, a typical assessment takes about four to five hours to complete and is submitted for managerial review.

8.      The patient assessment forms that coordinators complete for Defendant include a section where Ruiz would input the amount of time that the assessment had taken to complete from start to finish.  At one point, Health Service Manager Anna Chadis ("Chadis"), Ruiz's supervisor, instructed Ruiz to stop including this time information on assessments Ruiz submitted to her.

9.      Completing their assigned assessments was a challenge for all of Defendant's coordinators and frequently entailed working outside of Defendant's business operating hours, which are from 8:00 a.m. – 5:00 p.m. CST on weekdays.

10.     As a new employee, Ruiz received training from Kymra Raji, who confirmed to Ruiz that everyone was overworked and expected to work after hours to complete patient assessments.

11.     During the interview process, Defendant's recruiting team preapproved Ruiz for paid time off ("PTO") during her training period.  The PTO, initially set for around spring break, was requested so that Ruiz could take time off to deal with health challenges.

12.     Chadis convinced Ruiz to push back the PTO until after Ruiz had finished her training and could be assured of workload coverage.  Ruiz completed her training by April 2022 and then waited several more months before another opportune time arrived for her to take PTO.

13.     Arrangements were finally made for Ruiz to take one week of PTO covering the period from June 7, 2022 until June 13, 2022.  Ruiz took this PTO with the understanding that Defendant would cover her workload during her absence.

14.     Unfortunately, this was not the situation Ruiz found when she returned to work on Tuesday, June 14, 2022.  Ruiz was informed that although she had received no workload coverage during her PTO, she would still be expected to complete about ten days' worth of work in the four remaining days of the workweek.  When this inevitably proved impossible, Chadis threatened Ruiz with disciplinary action.

15.     Approximately eight years ago, Ruiz was diagnosed with attention-deficit hyperactivity disorder ("ADHD") and sees a neurologist to manage the symptoms.

16.     Chadis was not aware of Ruiz's diagnosis and did not know why Ruiz had taken PTO.

17.     Upon Ruiz's return to work, Chadis constantly badgered Ruiz with inappropriate questions about the details of Ruiz's medical condition.  Chadis displayed feelings of frustration and anger when Ruiz declined to divulge confidential specifics.

18.     In July 2022, Ruiz disclosed to Defendant that she had a medical disability and requested reasonable accommodation to complete the responsibilities of her job.  On July 11, 2022, Defendant acknowledged its receipt of Ruiz's accommodation request.

19.     Ruiz asked for a second computer monitor and, at her doctor's urging, requested to work a more flexible work schedule so she could take short breaks when needed and finish up assessments free of interruptions outside of Respondent's standard business operating hours.  Ruiz

specifically requested permission to periodically begin her workday before 8:00 a.m. or finish it after 5:00 p.m. in order to catch up on paperwork related to the patient assessments.

20.     In attempting to meet her patient assessment objectives, Ruiz found that Chadis's persistent micromanaging, which could entail as many as fourteen emails in a single day, prevented her from completing work in an efficient manner.

21.     The issue became so pronounced that Chadis's supervisor, Associate Director Sarah Hibbs ("Hibbs"), eventually had to step in and instruct Chadis to dial down the persistent communication with Ruiz.

22.     Defendant elected to provide Ruiz with a pay increase at around this time, which management informed her was generated based on analytical performance results.  The increase in compensation took effect with the pay period ending on July 30, 2022.

23.     Ruiz's request for a second computer monitor was granted, but the more vital request for flex time was denied.

24.     On August 3, 2022, Defendant, with input from both Chadis and Hibbs, did approve a narrower interpretation of flex time for Ruiz, but it required prior managerial approval for each and every use.

25.     Ruiz immediately attempted to make use of the accommodation when, on August 5, 2022, she put in a request to use flex time in the upcoming week.  Chadis denied the request, saying that it could not be validated because it was not conducive to business needs.

26.     The explanation Defendant gave to Ruiz was that a registered nurse ("RN") would not be available to supervise a LVN for any deviation from Ruiz's standard work schedule.

27.     Defendant's justification that Ruiz needed constant supervision to do her job does not withstand scrutiny.  When Ruiz contacted the Texas Board of Nursing, she was told that

because she was not engaged in direct patient care via her remote working arrangement, she did not have to be supervised by a RN to perform the work.

28.     Moreover, Ruiz was aware that some of her fellow coordinators would occasionally submit completed assessments in the early morning hours, outside of Defendant's business operating hours of 8:00 a.m. – 5:00 p.m.  Chadis would undoubtedly have known this work was done outside business hours because the assessments she reviewed included the time of submission.

29.     Defendant's denial of Ruiz's request to use flex time on August 5, 2022 was only the first of multiple instances where Defendant denied her flex time requests.

30.     Ruiz disputed this first denial and suggested to Chadis in an email sent on August 10, 2022 that under the company's interpretation of business needs, the supposed flex time given to her was essentially worthless as it would never be granted.  Subsequent events would demonstrate that Defendant's supposed business needs could be construed to repudiate any conceivable request for accommodation that Ruiz might make.

31.     Chadis's immediate and retaliatory response was to carry out her oft-repeated threat of placing Ruiz on a Corrective Action Plan ("CAP").  CAP documentation was completed on the very next day, August 11, 2022.  Despite the struggles other coordinators had in keeping up with assessments, only Ruiz was singled out for discipline in this way.

32.     On September 9, 2022, during a meeting with Chadis and Health Service Manager Tracie Williams ("Williams"), Ruiz asked to use her approved accommodation to take flex time for the second time.  Ruiz's request was rejected.

33.     At another meeting later in September 2022, Ruiz again asked to use her accommodation and was once again denied.  On this occasion, Ruiz was even questioned by Health Service Manager Karen Jones as to why Ruiz was still trying to get approval for flex time.

34.     On October 11, 2022, Ruiz made what was at the very least her fourth attempt to use her approved accommodation.  Defendant once again denied Ruiz the use of flex time, with Hibbs claiming that, of all things, Ruiz's CAP barred her from using a flex schedule altogether.

35.     As Defendant was unwilling to accommodate Ruiz's requests, Ruiz brought up the idea of shadowing a more experienced coordinator to see how they conducted patient assessments.  Williams suggested that Ruiz shadow one of her coordinators, Patricia Renehan ("Renehan").  Ruiz readily agreed and shadowed Renehan.

36.     After having her flex requests rejected, Ruiz was often advised to instead work on "offline templates" and "find time" as other employees did in the effort to complete more work.

37.     Renehan confirmed to Ruiz that she herself had to work on her own time to meet her assessment quotas, but that this was not an issue with Renehan's own supervisor, Williams, who allowed her coordinators to work on their own time.  It was precisely this kind of flexible working arrangement that Ruiz was seeking but that Defendant denied.

38.     Beginning in September 2022, Ruiz's department received approval for a more flexible work week.

39.     Other employees in Ruiz's department, including Chadis, were given this privilege of enhanced flexibility in their work schedules.  This included the option of working outside of the standard 8:00 a.m. – 5:00 p.m. window and the option of four-day workweeks.  These options were denied to Ruiz.

40.     Despite her medical need for flex work options, Ruiz was administratively ineligible for this opportunity because of the discriminatory and retaliatory CAP that she had been placed on.

41.     Defendant does not appear to have made allowance for any progress Ruiz made during her CAP in terms of reducing her backlog of outstanding assessments.  At one point, the number of these assessments was down to only two.

42.      Chadis's apparent animus toward Ruiz is reflected in Chadis's response to a situation in which Ruiz had completed her daily task list before departing work early for a doctor's appointment.  Despite being aware of the appointment, Chadis proceeded to email Ruiz with a series of supplemental tasks.  Knowing that flex time was not going to be an option, Ruiz was compelled to make the required supplemental phone calls from the parking lot of her doctor's office.

43.     Ruiz was always able to perform adequate work so long as she was given reasonable accommodation to work flex hours, a practice that her colleagues were clearly engaged in.

44.     On November 1, 2022, Ruiz was wrongfully terminated as a result of Defendant's failure to make good faith efforts to accommodate her disability and Defendant's retaliation against her when she sought such accommodation.

45.     Ruiz was terminated less than four months after she first approached Defendant seeking accommodation.

46.     In short, granting Ruiz's requests for flex time would have provided a reasonable solution for reducing her backlog of assessments.  Perplexingly, Defendant chose not to accommodate Ruiz, despite affording her colleagues the ability to exercise this very option.

47.     Ruiz's termination was discriminatory and retaliatory in violation of the Americans with Disabilities Act.

## ADA CLAIMS

48.     Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth verbatim.

### I.     ADA Discrimination

49.     "The ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).

50.     "To establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that [she] has a disability; (2) that [she] was qualified for the job; [and] (3) that [she] was subject to an adverse employment decision on account of [her] disability." *LHC Grp., Inc.*, 773 F.3d at 697.

51.     Once the prima facie showing is made, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).  The burden then shifts to the plaintiff to show the articulated reason is pretextual.  *Id.*

52.     The ADA defines the term "disability" as a "physical or mental impairment that substantially limits one or more major life activities of [an] individual."  42 U.S.C. § 12102(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

53.     In 2009, statutory revisions to the ADA broadened the definition of disabled.  42 U.S.C. § 12102(a)(4)(A) ("The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."); 29 C.F.R. § 1630.1(c)(4) ("reinstating a broad scope of protection under the ADA, the

definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA").

54.     The 2009 revisions further state that the intent of these changes is that employers stop engaging in "extensive analysis" to determine what constitutes a disability under the law, and focus instead on complying with their obligation not to discriminate and to provide reasonable accommodations to individuals who are otherwise qualified to do a job.  42 U.S.C. § 12101(b)(5).

55.     Ruiz has a disability as defined by the ADA, in that she has an attention-deficit hyperactivity disorder diagnosis that substantially limits one or more major life activities.  *See* 42 U.S.C. § 12102(1); *Maples v. University of Tex. Med. Branch at Galveston*, 524 Fed. Appx. 93, 95 (5th Cir. 2013).

56.     Ruiz was a qualified individual, as defined by the ADA, in that she could, with reasonable accommodation, perform the essential functions of her job.  *See* 42 U.S.C. § 12111(8).

57.     Ruiz was subject to an adverse employment decision on account of her disability in that her disability was a motivating factor in her termination.  *See LHC Group Inc.*, 773 F.3d at 702.

## II.     ADA Failure to Accommodate

58.     The ADA prohibits "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual."

59.     "To prevail on a failure-to-accommodate claim, the plaintiff must show (1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations."  *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (internal quotation marks and citations omitted).

60.     "A plaintiff can establish that [she] is qualified by showing that either (1) [she] could perform the essential functions of the job in spite of [her] disability, or (2) that a reasonable accommodation of [her] disability would have enabled [her] to perform the essential functions of the job." *Id.*

61.     Reasonable accommodations include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations." 42 U.S.C. § 12111(9)(B).

62.     When a disabled employee needs accommodation to perform her job duties, the employer is obligated by law to engage in an "interactive process," defined as "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Chevron Phillips Chemical Co.*, 570 F.3d at 621 (internal citation omitted).   The process requires "communication and good-faith exploration." *Id.*

63.     If an employer does not provide an employee a reasonable accommodation, the employer has the burden to demonstrate that the accommodation would impose an "undue hardship" on the employer. 42 U.S.C. § 12111(9)-(10).

64.     Defendant cannot demonstrate that allowing Ruiz actual use of an accommodation for flexible working hours was an undue hardship because this same option was granted to other coordinators.

### III.     ADA Retaliation

65.     To demonstrate unlawful retaliation under the ADA, a plaintiff must make a *prima facie* case of "(1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Tabatchnick*

*v. Continental Airlines*, 262 Fed. App'x. 674, 676 (5th Cir. 2008) (citing *Seaman v. CSPH*, 179 F.3d 297, 301 (5th Cir. 1999).

66.    "If the plaintiff establishes a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action.  If such a reason is provided, the plaintiff must submit sufficient evidence that the proffered reason is a pretext for retaliation.  The employee must show that but for the protected activity, the adverse employment action would not have occurred." *Id.*

67.    Close timing between an employee's protected activity and an adverse action against her may provide the causal connection required to make out a prima facie case of retaliation. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001).  A "time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Id.*; *Cantu v. Vitol, Inc.*, No. H-09-0576, 2011 WL 486289 at *10 (S.D. Tex. Feb. 7, 2011) (Rosenthal, J.) (noting that "the Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link.").

68.    Defendant responded to Ruiz complaining about her accommodation request being denied by immediately placing her on a CAP, which in turn ensured that all future accommodation requests would be administratively denied.  In doing so, Defendant attempted to run an end-around its obligation to accommodate Ruiz by deploying a policy that allowed it to block any of Ruiz's future requests for accommodation.  The problem with Defendant's clever maneuver is that it constitutes illegal retaliation under the ADA.  Thus, Defendant irreversibly committed a double violation of the ADA: failing to accommodate Ruiz in the first place and then retaliating against her in the second place.

69.     The placement of Ruiz on a CAP, barring her from any possibility of flexible work options, ultimately deprived Ruiz of the reasonable work modifications she is entitled to under the ADA and was weaponized to justify the termination of her employment.

70.     Ruiz suffered damages as result of these violations of the ADA and seeks to recoup those damages in this action.

71.     Plaintiffs who prevail in an ADA discrimination or retaliation claim are entitled to back pay.  The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

72.     Prevailing plaintiffs are also entitled to reinstatement as an equitable remedy.  *See Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 1992).  If reinstatement is not feasible, front pay will be awarded in a manner consistent with the remedial purposes of the law.  *See Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992).  Unlike back pay, front pay refers to future lost earnings.  Front pay awards can be substantial.  *See, e.g.*, *Jackson v. Host Intern., Inc.*, Nos. 09–51137, 10–50026, 2011 WL 2119644, at *8-9 (5th Cir. Feb. 1, 2011) (Fifth Circuit decision affirming front-pay award in a discrimination case); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (same); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 88 (3rd Cir. 2009); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004), *vacated on other grounds sub nom, KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574 (7th Cir. 1995); *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993).

73.     Prevailing plaintiffs are also entitled to attorney's fees and costs and Plaintiff seeks to recoup these amounts.

74.     All conditions precedent to this suit have been fulfilled.

## **JURY DEMAND**

75.     Plaintiff demands a jury trial.

## **DAMAGES AND PRAYER**

Plaintiff asks that she be awarded a judgment against Defendant for the following:

a.      Actual damages in the amount of lost back pay, lost benefits, and other economic losses;

b.      Reinstatement or front-pay;

c.      Compensatory damages;

d.      Punitive damages;

e.      Prejudgment and post-judgment interest;

f.      Court costs;

g.      Attorney's fees; and

h.      All other relief to which Plaintiff is justly entitled.


Respectfully submitted,


 /s/ Ahad Khan
Ahad Khan
Texas Bar No. 24092624
S.D. Texas ID No. 2981398
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3558 – Telephone
ak@ahadkhanlaw.com – Email

ATTORNEY FOR PLAINTIFF
BARBARITA RUIZ